# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,           )
                             )
                Plaintiff,   )
                             )        Case No.:    2503015162
        v.                   )
                             )
JAHEIM BARKLEY,              )
                             )
                Defendants.  )

Submitted: July 7, 2026
Decided: July 8, 2026

## OPINION AND ORDER
*On Defendant's Pretrial Motions*

## DENIED in part / GRANTED in part

*Paige Todaro and Carly Wasko, Deputy Attorneys General*, Attorney General's Office, 820 N. French Street, 7th floor, Wilmington, Delaware, *Attorney for the State.*

*Paige Chapman and Penelope O'Connell, Assistant Public Defenders*, Office of Defense Services, 820 N. French Street, 3rd floor, Wilmington, Delaware, *Attorney for Defendant.*

**Jones, J.**

Defendant, Jaheim Barkley ("Barkley"), is scheduled for a jury trial on July 9, 2026, on the indicted charges of Assault First Degree, Possession of a Firearm During the Commission of Felony, and Possession of a Weapon with a Removed, Obliterated or Altered Serial number.

Defendant has filed two pretrial motions. The first motion is a motion in limine to Preclude in Court identification. The second motion is a motion in limine to Preclude Identity-Assuming References to the video suspect as the Defendant. This is the Court's decision on these two motions.

## FACTS

The state has accused Barkley of being the perpetrator in a shooting that allegedly took place on March 28, 2025, in the area of 1315 N. Walnut Street, Wilmington, Delaware at approximately 8:10 a.m. The victim, DW, was in her vehicle when a person approached her closed driver side window, pointed a gun and said, "you know what this is." The person began shooting. The victim tried to get away but was hit in the arm by a bullet. The victim then drove herself to Wilmington Hospital for treatment.

Wilmington police responded to the 1300 block of N. Walnut Street in reference to a shot spotter notification. Upon their arrival they found nine .40 caliber casings located in the 300 block of Kennebec Street. Also located in the area was broken glass near the intersection of Kennebec and N. Walnut Street. Wilmington police were notified that a shooting victim had arrived at the Wilmington Hospital

in her personal vehicle. The police learned that the victim had been shot in the arm and sustained a broken left arm.

Wilmington police were able to locate the victim's vehicle in the hospital parking garage. The vehicle was observed to have a shattered front driver side window, a shattered rear window and bullet holes to the rear of the vehicle.

Wilmington city police Detective Nolan interviewed the victim at 8:20 a.m. At that time, DW told Nolan that she did not know who shot her but was able to describe her assailant as a short, black male, about 5'4" of unknown weight, who was wearing black, a hood and ski mask. At 8:59 a.m., Nolan again interviewed the victim. The victim informed Nolan that a person came up to her car and shot her. Again, she denied knowing who the person was. She also denied arguing with anyone or having "beef" with anyone.

At 9:17 a.m., Nolan interviewed the victim's mother. Nolan asked Mother if her child had "beef" with anyone. Mother told Nolan that victim used to have a friend she stopped speaking to some eight months prior and that is the only person victim ever had "beef" with. Mother identified "Jaheim" as being the former friend.

Approximately 2.5 hours later, the police presented the victim with a six-person line up. Detectives informed the victim before presenting the lineup that the suspect may or may not be in the photos and that she was not to simply pick at person at random. After looking at the lineup for approximately 18 seconds, the victim identified photo number two as the person who shot her. Photo number two was

Jaheim Barkley. She recognized the defendant as Jahiem Barkley. While Defendant was wearing a mask, she was able to view his eyes and hear his voice when he said, "you know what this is." The victim indicated that Defendant then proceeded to take the gun from his pocket. Upon seeing the gun, the victim attempted to flee. As the victim fled Defendant fired several shots at her and her vehicle. Victim told Nolan that the person who shot her was an old friend of hers whose name is Jahiem.

The state has produced security camera footage from Young's Deli located at 1300 N. Walnut Street dated March 28, 2025, from approximately 8:01 a.m. to 8:11 a.m. The footage shows a person in a hooded sweatshirt and mask walking in the area of the Deli.

## MOTION TO PRECLUDE IN-COURT IDENFITICATION

Defendant moves to suppress the victim's pretrial identification on the grounds that the Detectives used an unduly suggestive procedure.

"To satisfy due process, pretrial identification resulting from a suggestive process must comport with the two-part analysis set forth by the United States Supreme Court in *Neil v. Biggers*."[1] The first step in the analysis "is to determine whether the identification procedure was impermissibly or unnecessarily suggestive.[2] The defendant has the burden of proof in the first instance.[3] Because Due Process rights protect against improper state action, Defendant must identify

---

[1] *State v. Turner*, 2023 WL 3909799, at *2 (Del. Super. Ct. June 8, 2023) (citing *Neil v. Biggers*, 409 U.S. 188 (1972)).
[2] *Byrd v. State*, 25 A.3d 761 (Del. 2011) (citing *Biggers*, 409 U.S. at 197-99).
[3] *Turner*, 2023 WL 3909799, at *2.

some aspect of police procedure in this case through which officers improperly steered the victim toward Defendant.

The photo array was a six-person array. Delaware courts have repeatedly concluded that "standardized" six-photo arrays are permissible so long as the presentation of the photos does not direct the witness, implicitly or explicitly, to a particular individual's picture.[4] In this case, the detectives employed a neutrally presented standardized six-person photo array. There is simply no evidence that the detectives' conduct shows any signs of encouragement or coercion. The fact that the victim's mother may have told her Defendant was the person who shot her is not sufficient to establish improper suggestiveness. While the detectives initially heard Defendant's name from mother, there is no Delaware authority holding that a detached family member cannot suggest a suspect to police prior to an independent victim identification. There is simply nothing in the record that suggests law enforcement communicated that information to victim or directed victim to Defendant before or during the photo array identification process.

The fact that the victim initially told police she could not identify the shooter does not make the subsequent photo array suggestive. These facts are matters for

---

[4] *State v. Jones*, 2011 WL 3908353, at *2 (Del. Super. Ct. Aug. 18, 2011); *Barnard v. State*, 879 A.2d 602 (Del. 2005); *Elam v State*, 2001 WL 46379 (Del. 2001); *see State v. Holmes*, 2012 WL 4086169, at *7 (Del. Super. Ct. Aug. 23, 2012) (quoting *U.S. ex rel. Goodyear v. Del. Corr. Ctr.*, 419 F.Supp. 93, 96 (D. Del. 1976)) ("An identification is suggestive when the police conduct it in such a way that the witness' attention is directed to a particular individual as the suspect upon whom the police have focused."); *see also State v. Sierra*, 2011 WL 1316151 (Del. Super. Ct. Apr. 5, 2011).

cross-examination, not exclusion, absent independent suggestive conduct on the part of the police, which is simply not present in this case.[5]

Defendant's argument that the victim's identification must have been the product of police suggestiveness ignores the victim's own knowledge of Defendant. The victim and Defendant were friends, lived around the corner from each other and interacted with each other. Delaware courts have held that where a victim has close personal knowledge of the defendant from previous interactions, courts are less likely to find that an identification procedure is presumably suggestive because the victim has an independent, rational basis for making that identification absent any police conduct.[6]

Even assuming *arguendo* that the photo array procedure in this case was impermissibly suggestive, evidence of Victim's identification cannot be excluded at trial so long as the identification remains sufficiently reliable.[7] To violate Due Process rights, an identification procedure must carry with it "a very substantial likelihood of irreparable misidentification."[8] To determine whether an identification procedure is reliable enough such that it does not present this likelihood, Delaware courts apply the five-factor totality of the circumstances

---

[5] *See Elam v. State*, 2001 WL 46379, at *2 (Del. 2001).
[6] *See Redden v. State* 269 A.2d 227, 228-29 (Del. 1970).

[7] *Ruffin v. State*, 131 A.3d 295, 306 (Del. 2015) (citing *State v. Sierra*, 2011 WL 1316151, at *3 (Del. Super. Apr. 5, 2011)); *State v. Short*, 2005 WL 2841613, at *2 (Del. Super. Ct. Oct. 25, 2005); *see also Galloway v. State*, 2004 WL 68802, at *1 (Del. 2004)
[8] *Simmons v. United States*, 390 U.S. 377, 384 (1968); *State v. Sierra*, 2011 WL 1316151, at *3 (Del. Super. Ct. Apr. 5, 2011)).

test established by the United States Supreme Court in *Neil v. Biggers.*[9] The *Biggers* factors include the following:

(1) the opportunity of the witness to view the criminal at the time of the crime;
(2) the degree of attention the witness paid during the crime;
(3) the accuracy of the witness's prior description of the criminal;
(4) the level of certainty demonstrated by the witness at the time they are "confronted" by police; and
(5) the length of time between the crime and the confrontation between police and witness.[10]

Applying and weighing the *Biggers* factors here demonstrates that Victim's identification is reliable.

First, Victim had a clear opportunity to view Defendant during the commission of this crime. The shooter was positioned closely enough for Victim to clearly observe his physical form, notice his firearm and hear his voice.

Second, Victim was paying attention during the encounter. The Defense's assertion that Victim was not paying attention because she drove away is unfounded. Her ability to react immediately to the threat of violence by driving away only supports that Victim was keenly attentive during this encounter.

Third, Victim's prior description of Defendant was highly accurate considering the circumstances. Relying entirely on her independent memory in

---

[9] *Biggers*, 409 U.S. 188; *Younger v. State*, 496 A.2d 546, 550 (Del. 1985) (illustrating that Delaware follows *Biggers'* totality test); *Byrd*, 25 A.3d at 764; *Turner*, 2023 WL 3909799, at *2.

[10] *Biggers,* 409 U.S. at 199-200. These factors are weighed together under the totality of the circumstances, with no one factor acting dispositively. *See id.*

7

the immediate wake of a traumatic injury, Victim correctly identified the shooter's skin color as black and correctly estimated his height at 5'4".

Fourth, Victim demonstrated adequate certainty when identifying Defendant from the photo array.

The Defense attempts to frame Victim's initial inability to spontaneously name the shooter within thirty minutes to an hour after being shot as an inconsistent change of mind indicative of uncertainty. However, the inability to immediately recall a suspect's name does not preclude a later identification from being held reliable.[11] Again, this matter can be the subject of cross-examination.

Finally, the length of time between the crime and Victim's confrontation with police supports reliability. Victim identified Defendant approximately three hours after the shooting.

Weighing these factors together, Victim's identification of Defendant holds strong indicia of reliability that overcome any alleged suggestiveness. While no single *Biggers* factor is dispositive, here, each factor favors reliability. Considered together, they outweigh any alleged suggestiveness in the identification procedure. Defendant cannot establish a very substantial likelihood of irreparable misidentification, and the Motion to Suppress must be and hereby is **DENIED**.

---

[11] *See Clayton v. State*, 2006 WL 141027, at *2 (Del. 2006) ("[U]nder the totality of the circumstances, the three-month hiatus between the commission of the crime and the photographic line-up is not sufficient to render the identification unreliable and inadmissible per se but was another factor for the jury to consider in assessing the credibility of Diaz's identification of Clayton."); *see also State v. Holmes*, 2012 WL 4086169, at *13 (Del. Super. Ct. Aug. 23, 2012).

**MOTION RELATED TO THE VIDEO AND THE OFFICER'S TESTIMONY RELATED TO THE SAME**

There is a video from the Deli which shows a person at the location of the shooting who is wearing black, is about 5'4", wearing a sweatshirt and a mask. Defendant seeks a ruling that any State witness be precluded from testifying that the person in the video is Defendant as this invades the province of the jury and runs afoul of Delaware law.

Under Delaware law, identity is a question of fact reserved for the jury, not a matter to be resolved by witness opinion, labels, or narration. The Delaware Supreme Court has repeatedly emphasized that lay opinion testimony is improper where it tells the jury who committed the crime, particularly when the jury can review the same evidence and make its own determination. In *Thomas v. State*, the Court cautioned us on this very subject:

> "The ultimate question of the identity … remains one for the jury to decide, and lay opinion testimony will not be helpful to the jury 'when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion." … We have serious reservations about the admission of this type of identification testimony. It is unclear to us how the testimony of a police officer—or any other witness without a particular expertise in comparing a videographic representation of a person with a suspect or defendant—would be helpful to the factfinder in resolving an identification issue.[12]

---

[12] *Thomas v. State*, 2019 WL 1380051, at *3 (Del. 2019) (quoting *Cooke v. State*, 97 A.3d 513, 547 (Del. 2014)) (footnote omitted).

Similarly, in *Saavedra v. State*, the Court warned against narrative identification and stressed that courts must exercise "due caution" before permitting any testimony that risks resolving identity for the jury rather than assisting it:

> Before a law enforcement witness uses a video clip or photograph to identify the defendant, due caution should be exercised to ensure that a proper foundation is laid establishing, to the trial court's satisfaction, that the witness has a special familiarity with the defendant that would put him in a better position than the jury to make the identification. And in determining whether the witness occupies such a position, the court should also consider whether the images from which the identification is to be made "are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification."[13]

Most recently, in *Johnson v. State*, the Supreme Court reaffirmed the boundary: witnesses may provide neutral, uncontroversial descriptions of what a video depicts, but may not offer identification opinions, expressly noting that identity determinations remain the jury's function.[14] The *Johnson* Court noted that the officer in the trial case below simply described what he saw on screen:

> Stafford was never asked to identify Johnson in the video, nor was he asked to provide any other lay-opinion testimony that would bring to bear the concerns we expressed in *Thomas, Saavedra*, and other cases involving lay-opinion testimony by police officers. Even when prompted by the State to describe some of his observations from one of the videos as "characteristics that suggest [the person in the video] may have been [Johnson][,]" Stafford responded, "[f]rom my understanding that's for the jury to decide." *Stafford's testimony*

---

[13] *Saavedra v. State*, 225 A.3d 364, 381 (Del. 2020) (quoting *U.S. v. Jackman*, 48 F.3d 1, 4–5 (1st Cir. 1995)) (footnotes omitted).
[14] *See Cooke v. State*, 97 A.3d 513, 546-47 (Del. 2014).

*was limited to providing a neutral explanation for the jury of what he saw in each video.*[15]

Under the above cases, it is permissible for the video to be played to the jury. It is also permissible for the detectives to testify as to the detectives' own observations of Defendant's gait and build. However, the detectives may not offer any testimony concerning Defendant's build and gait as seen in the video. Nor can any witness compare his observations of gait and build with the gait and build of the person depicted in the video. Any such comparison is proper for discussion in a closing argument but is not proper a question to ask a witness.[16]

For the above reasons, Defendant's motion as to the testimony surrounding the video is **GRANTED**.

         **IT IS SO ORDERED**.

        _____
        Francis J. Jones, Jr., Judge

cc:  Original to Prothonotary

---

[15] *Johnson v. State*, 342 A.3d 1157, 1163 (Del. 2025) (quoting App. Brief) (footnotes omitted) (emphasis added).

[16] Implicit in this ruling is a conclusion that the detectives' discussion of Defendant's build and gait is proper lay testimony. The testimony is rationally based on the witness's perception, it will be helpful to determine a fact at issue and it is not based on scientific, technical or other specialized knowledge. D.R.E. 701; *Cooke*, 97 A.3d at 546-47.

11